## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

MICHAEL TAYLOR,

        Petitioner,

v.                                     Case Number: 07-CV-10666

KENNETH T. MCKEE,

        Respondent.

_____/

### OPINION AND ORDER DENYING PETITIONER'S "PETITION
### FOR WRIT OF HABEAS CORPUS" AND DECLINING TO
### ISSUE A CERTIFICATE OF APPEALABILITY

On February 14, 2007, Petitioner Michael Taylor, a state inmate currently incarcerated at the Muskegon Correctional Facility in Muskegon, Michigan, filed a *pro se* application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In his *pro se* application, Petitioner challenges his convictions and sentences for (1) five counts of first-degree criminal sexual conduct, Mich. Comp. Laws § 750.520b, (2) one count of second-degree criminal conduct, Mich. Comp. Laws § 750.520c, (3) one count of delivery of marijuana to a minor, Mich. Comp. Laws § 333.7410(1), and (4) one count of furnishing alcohol to a minor, Mich. Comp. Laws § 436.1701(1).  For the reasons stated, the court will deny the petition for a writ of habeas corpus.  The court will also decline to issue Petitioner a certificate of appealability.

## I.  BACKGROUND

This case arises from allegations that Petitioner furnished marijuana and alcohol

to neighborhood teenagers and sexually assaulted one of the teenage girls at his former girlfriend's home.  The prosecution alleged that Petitioner supplied thirteen-year-old K.C.[1] with alcohol and marijuana and then engaged in digital, oral, and penile sex with her.  The defense admitted that Petitioner furnished alcohol and marijuana to the neighborhood teens but denied that Petitioner had sexual relations with K.C.  Rather, the defense argued that when Petitioner refused to sell K.C. a requested quantity of marijuana, she became angry and retaliated against him by fabricating the allegations of sexual abuse.

The trial in this case began on January 8, 2002.  Fifteen-year-old G.H. was the first witness to testify.  He testified that he lived "down the street" from Dena Miller, Petitioner's former girlfriend, where Petitioner lived at the time of the incident.  (Trial Tr. vol. I, 119, Jan. 8, 2002.)  G.H. said that he visited the Miller house many times, and that he knew K.C. from school.  According to G.H., on March 19, 2001, he and Petitioner picked K.C. up at her house and went to the store, where Petitioner purchased alcohol and cigarettes.  G.H. said that they then went to Miller's house and smoked marijuana and cigarettes and drank alcohol.

G.H. further testified that, on the night in question, K.C. went into the bedroom, alone, and then Petitioner followed and closed the door.  G.H. said that he then left the house for about fifteen minutes, and, when he returned, he knocked on the bedroom door.  According to G.H., both K.C. and Petitioner answered, stating that they would be "out in a couple minutes."  (Trial Tr. vol. I, 140.)  G.H. testified that K.C. and Petitioner

---

[1]Rather than using the full names of those involved, the initials of the minors are used to protect their identities.

3

subsequently came out of the bedroom fully clothed.  It was G.H.'s testimony that Petitioner said, "I got to use the bathroom real quick.  I got to go brush my teeth and wash my hands and wash my face."  (Trial Tr. vol. I, 142.)  He said that K.C. sat at the table, looking a little sick and pale.

According to G.H.'s testimony, shortly afterward, he and Petitioner took K.C. to her friend G.L.'s house.  G.H. acknowledged that at the preliminary hearing he testified that Petitioner knew G.H. understood what had happened and that Petitioner had threatened G.H. if G.H. told anyone about the incident: "[Petitioner] said I know you know what happened.  And if you tell anybody, I'll hurt you."  (Trial Tr. vol. I, 149.)  As a result, G.H. said that he did not tell anyone what happened that night because he was afraid.  When asked why he was afraid, G.H. replied, "[a]nd plus, Mike, he's already a killer, so I didn't want – I ain't about to tell anybody."  *Id.*

Defense counsel did not immediately object to G.H.'s statement and request a mistrial.  Rather, defense counsel requested a mistrial the day following G.H.'s testimony; the trial judge denied his request.[2]  The trial judge said, "I am going to deny the motion at this time.  I am going to ask that the attorneys try and put together a curative instruction.  And we will review that curative instruction, and then give it to the jury once we put it in final form."  (Trial Tr. vol. II, 162, Jan. 9, 2002.)[3]

_____

[2]Petitioner was previously charged with first-degree murder, the result of an incident that occurred in 1986.  He pleaded guilty to manslaughter and was sentenced to five- to fifteen-years imprisonment, thirteen of which he served.

[3]The instruction given to the jury was as follows: "You may have heard an unsolicited comment by a witness, [G.H.], regarding the character of the defendant. You are to totally disregard his testimony in that respect."  (Trial Tr. vol. IV, 564, Jan. 11, 2002.)

4

On cross-examination, G.H. testified that he told the police that K.C. told him that she had lied because she was afraid that she would get in trouble.  He also admitted that he, too, had lied.

K.C. testified next.  She testified that she met Petitioner and his ex-girlfriend, Dena Miller, through her neighbor and friend G.H.   According to K.C., she visited Miller's house several times.  She testified that on the first occasion, sometime in March 2001, G.H. and Petitioner picked her up near her house and drove her to Miller's house. She said that, while there, she smoked cigarettes and marijuana and drank some alcohol, all supplied by Petitioner.  K.C. testified that she subsequently did not feel well and went into the bedroom to lie down.  She said that G.H. then came into the bedroom with her and stayed for about fifteen to twenty minutes.

K.C. further testified that, on or about March 19, 2001, she had a fight with her father and left her house.  She said that Petitioner and G.H. picked her up, and, before they went to Miller's house, they stopped at a store, where Petitioner purchased Apple Pucker, an alcoholic beverage, and some cigarettes.  K.C. testified that, when they got to the Miller house, Petitioner told them that they had to go in through the back door because he did not want the neighbors to see them going into the house.  According to K.C., while at the Miller house, she smoked some cigarettes and marijuana and drank some alcohol supplied by Petitioner.  K.C. testified that she subsequently did not feel well: "I felt like I drank too much, or I smoked too much."  (Trial Tr. vol. II, 207.)  K.C. said that Petitioner told her she looked pretty and "stuff like he wanted to take me in the bedroom and do stuff with me."  (Trial Tr. vol. II, 209.)  She said that Petitioner then "got up, and then I was sitting in the chair, and he grabbed my hand and took me into the

5

bedroom." *Id.* According to K.C., Petitioner closed the bedroom door, leaving G.H. sitting at the dining room table, which was just outside the bedroom door.

K.C. then testified to the following events: when she entered the bedroom, she said that she sat down on the bed and Petitioner removed his clothes. According to K.C., Petitioner then positioned her so that she was lying on her back on the bed. She said that she felt sick, afraid, and unable to control her limbs. It was K.C.'s testimony that Petitioner then took all her clothes off, touched her breasts, and penetrated her vagina with his finger, tongue, and penis. She said that he ejaculated on her stomach and then offered her a towel to wipe it up. K.C. further testified that she then got dressed and returned to the dining room. She said that G.H. was present when she returned.

According to K.C., Petitioner was in the bedroom with her for about one hour. She said that she recalled that while they were in the bedroom, she heard a knock on the front door of the house, and she also heard G.H. knocking on the bedroom door and talking to someone. K.C. testified that she did not tell G.H., or anyone else, about the incident that occurred in the bedroom with Petitioner. She said that Petitioner and G.H. then drove her to her friend G.L.'s house. K.C. testified that she did not tell anyone until approximately five days later when she finally told her friends, G.L. and Kayla C., about the incident that occurred with Petitioner. She said that she also eventually told her father of the incident, and he said, "[e]ither you speak up or you pack your bags and get out." (Trial Tr. vol II, 248.) K.C. also testified that she later informed Detective Fink about the incident.

6

K.C. acknowledged that it was Miller who eventually called the house and told her father about the incident.  She said that she and her father then left the house and went to various hotels because she was afraid.  K.C. testified that Petitioner called her house after the incident, but she hung up on him.

On cross-examination, K.C. admitted that she and G.H. had asked Petitioner to purchase the alcohol for them.  She also acknowledged that Petitioner did not drag her into the bedroom, but rather, he just grabbed her hand and took her there.  According to her cross-examination testimony, she did not tell Petitioner to stop, she did not try to leave the room, and she did not call for help.  She also admitted that she lied to the police about some things.

Following K.C.'s testimony, the prosecution made a motion to the trial court to admit other acts evidence, pursuant to Mich. Ct. R. 404(b).  Under that rule, three witnesses testified outside the presence of the jury: Kayla C., S.P., and Dena Miller, Petitioner's former girlfriend.  After the trial court granted the motion, the prosecution preceded to present its witnesses.

Fifteen-year-old S.P., one of the 404(b) witness, testified that she lived around the block from Miller.  She said that about two years prior to the incident in question, she was visiting Miller's house, and, while Miller was in the bathtub, she was playing Nintendo in the bedroom and Petitioner was vacuuming.  According to S.P., Petitioner entered the bedroom and told her that he thought she was beautiful and that he wanted to make out with her.  S.P. said that Petitioner told her not to tell G.H. or Miller's daughter.

7

S.P. further testified that, on a separate occasion, she heard G.H. and Petitioner discussing having sex with her. She said that Petitioner came over to her and said, "I told him if he don't f--- you first, I will." (Trial Tr. vol. III, 326.) S.P. also testified that Petitioner told her that he would have to get her drunk or high before she would do something with him. According to S.P., on one occasion, when she borrowed cigarettes from Petitioner, which actually belonged to Miller, Miller opposed giving S.P. the cigarettes. S.P. said that Petitioner told Miller, "Don't worry. She'll pay me back by giving me head later, or blow job, or something." (Trial Tr. vol. III, 328.) S.P. testified that Petitioner touched her leg below her buttocks; she said that he was flirtatious and never did anything to her when she said no.

Fourteen-year-old Kayla C., another one of the 404(b) witnesses, testified next. It was her testimony that Petitioner and G.H. picked her and K.C. up one night and took them to Miller's house, where they drank alcohol and smoked cigarettes and marijuana. According to Kayla C., K.C. went into the bedroom with G.H. Kayla C. testified that Petitioner then came over to her, sat on the couch next to her, and asked her if he could kiss her. Kayla C. said that she was scared and told Petitioner that she and K.C. had to leave. She said that she then went into the bedroom and saw K.C. buttoning her pants and fastening her belt. Kayla C. said that Petitioner asked her and K.C. if they "would ever do anything with an older guy." (Trial Tr. vol. III, 350.) Kayla C. acknowledged that, despite Petitioner's flirting, he never touched her.

Kayla C. further testified that, a few days later, she saw K.C. and K.C. told her that she had sex with Petitioner. Kayla C. said that K.C. told her that she had gotten into a fight with her dad and then left with Petitioner and G.H. and went to Miller's

8

house.  Kayla C. described K.C. as acting different.  She said that they were sitting at the computer, when K.C. typed out "I f----- . . . .  The older guy."  (Trial Tr. vol. III, 348.) According to Kayla C., K.C. seemed very serious when she was relating the incident to her.

Dena Miller testified next.  She testified that she knew Petitioner for more than two years and that she was "sort of" his girlfriend, but that there was a "lot of stuff going on, so he moved out, but he was over a lot."  (Trial Tr. vol. III, 359, Jan. 10, 2002.) According to Miller, S.P. and G.H. were at her house all the time.

Miller further testified that, during the time of the alleged incident, she was in a rehabilitation program because she was addicted to pain medications.  She said that she was discharged on or around March 24, 2001, and that Petitioner picked her up. According to Miller, when Petitioner picked her up, he showed her a bottle of Apple Pucker that he had under the car seat.  She said she became angry because she had just been released from the rehabilitation program and knew that he did not drink.

According to Miller's testimony, shortly after they arrived at her home, G.H. showed up and said the Apple Pucker belonged to him.  Miller said that she told G.H. that he could not have it, and that eventually, Petitioner poured it down the kitchen drain.  Miller further testified that she also witnessed Petitioner giving S.P. four cigarettes, telling her that "I will come over for my blow job tomorrow morning."  (Trial Tr. vol. III, 378.)

Miller testified that after that incident, she spoke with G.H. and K.C. about what occurred at the house while she was in the rehabilitation program.  Miller said that she telephoned K.C., and K.C. "was embarrassed, and she was sorry, and she didn't want

me telling her dad.  So, you know, she said that there is sexual stuff that happened in the bedroom, but she didn't feel right telling me."  (Trial Tr. vol. III, 380.)  Miller testified that she told K.C. not to be afraid and that she would help her.  According to Miller, based on the information that she got from K.C., G.H., and S.P., she called the police.

On cross-examination, Miller acknowledged that Petitioner denied having sex with K.C., and that K.C. told her that she was drunk and could not recall what actually happened on the night in question.

Detective Timothy Fink, a Saginaw police officer, assigned to investigate the case, testified next.  Detective Fink said that when he first spoke to Petitioner, Petitioner denied even knowing K.C.  He also testified that when he first spoke to K.C., she denied having a sexual encounter with Petitioner.  However, during a subsequent interview, K.C. told Detective Fink that, after she had a fight with her father on the night in question, G.H. and Petitioner picked her up at her house.  She told Detective Fink that they went to the store, where Petitioner purchased alcohol and cigarettes, and then Petitioner took her to Miller's house.  Detective Fink testified that K.C. told him that, while at the house, she drank alcohol and smoked cigarettes and marijuana.  According to Detective Fink, K.C. also told him that Petitioner was "swishing" her drink around and telling her that he was making it colder.  He said that she told him that she became dizzy, felt sick, and could not control her muscles.

Detective Fink further testified that K.C. told him that Petitioner told her that she was beautiful and that Petitioner took her into the bedroom.  According to Detective Fink, K.C. told him that Petitioner removed his clothes, and hers, and then penetrated her vagina with his finger, tongue, and penis.  Detective Fink testified that he

10

interviewed G.H. about the allegations, and, although G.H.'s version was not at variance with K.C.'s, G.H. minimized his involvement in the situation.

On cross-examination, Detective Fink testified that Miller told him that K.C. told her that she did not have sex with Petitioner.  He said that Miller told him that G.H. may have had sex with K.C.  Detective Fink acknowledged that G.H. lied about a lot of things: he said that G.H. denied that he drank alcohol and smoked marijuana, but that he eventually admitted to drinking two glasses and smoking one- and one-half joints.  Detective Fink also acknowledged that the police report did not indicate that K.C. alleged digital penetration, but rather, it indicated oral and penile penetration.  However, another police report indicated that she alleged digital and penile sex, but it did not indicate oral sex.

The prosecution then rested.  The parties stipulated to a laboratory report: a pair of K.C.'s jeans that was sent to be tested for semen.  The results were negative.

The first witness to testify for the defense was thirty-five-year-old Pohanna Pelepchuck.  Pelepchuk, a friend of Petitioner's sister, testified that she was acquainted with Petitioner for about three years.  According to Pelepchuck, Petitioner was a known flirt and had flirted with her on numerous occasions.  However, Pelepchuck said that Petitioner neither acted upon his flirting nor touched her in an inappropriate manner.

Marjorie Emmendorfer, another one of Petitioner's sister's friends, testified that she had known Petitioner for approximately three years.  She also testified that Petitioner was a known flirt and that she had seen him flirt with other females.  Emmendorfer testified that Petitioner had never touched her inappropriately.  Emmendorfer was thirty-four-years-old at the time of trial.

11

Petitioner testified.  He said that, on March 19, 2001, G.H. asked him to pick up K.C. and Kayla C. and take them to Miller's house, which he did.  He said that he supplied them with alcohol, cigarettes, and marijuana.  Petitioner acknowledged that he was an outrageous flirt and that he was flirting with Kayla C. that night but "backed off" when she appeared unhappy with his conduct.  (Trial Tr. vol. IV, 450.)  According to Petitioner, he did not recall that K.C. was sick that night, but he did remember that she and G.H. went into the bedroom at some point.  It was his testimony that he was watching television with Kayla C. when she became uncomfortable and wanted to leave.  He said he went into the bedroom and saw G.H. "coming up off her."  (Trial Tr. vol. IV, 451.)  He said that K.C. was dressed but was zipping up her pants.  Petitioner said he then drove the girls home.

Petitioner further testified that the next night G.H. again asked him to pick up K.C. and take her to the Miller house.  He said that they picked her up and then drove to a store where he purchased Apple Pucker and cigarettes at G.H.'s request.  Petitioner acknowledged that they all drank the Apple Pucker and smoked cigarettes and marijuana; he said that K.C. drank about four ounces of alcohol.

According to Petitioner, G.H. then left, and Petitioner went into the bedroom to put away a bag of marijuana and roll another joint.  He said that K.C. followed him into the bedroom and asked him, "if I would do something with her for an amount of weed." (Trial Tr. vol. IV, 455.)  Petitioner said that he responded, "if Dena ever found out [that I] was in bed with [you], she would kill me."  (Trial Tr. vol. IV, 456.)  Petitioner testified that there was no physical contact between them: there was no kissing, touching, or sexual penetration.

12

Petitioner further testified that G.H. returned while he was still in the bedroom with K.C.  Petitioner said that G.H. knocked on the door, but he told him to wait until he was finished talking to K.C.  He said that K.C. was high from smoking marijuana, and that she was angry when he refused to get her the requested marijuana.  According to Petitioner, he subsequently drove to a store, along with K.C. and G.H., and purchased some soda.  He said that he then dropped K.C. off behind the store.  Petitioner denied threatening K.C. or G.H.

Following a five-day jury trial in Saginaw County Circuit Court, on January 14, 2002, Petitioner was convicted as stated above.  On March 6, 2002, he was sentenced, as a fourth habitual offender,[4] to (1) five concurrent terms of forty- to sixty-years imprisonment for the first-degree criminal sexual conduct convictions, (2) one concurrent term of forty- to sixty years imprisonment for the second-degree criminal sexual conduct conviction, (3) one concurrent term of ten- to fifteen-years imprisonment for the furnishing of alcohol to minor conviction, and (4) one concurrent term of ten- to fifteen-years imprisonment for the delivery of marijuana to a minor conviction.

Petitioner filed his right of appeal in the Michigan Court of Appeals, raising the following claims:

> I.      Where [Petitioner] was on trial for first-degree criminal sexual conduct, the trial court abused its discretion when it denied [Petitioner's] motion for a mistrial following a witness' unfairly-prejudicial comment that [Petitioner] was "already a killer."
>
> II.     [Petitioner was] denied his due process right to a fair trial where the trial court admitted, over objection,

---

[4]Mich. Comp. Laws § 769.12.

13

other acts evidence contrary to MRE 404(b) where there was no proper purpose offered, no logical relevance, the acts were not similar, and the evidence was more prejudicial than probative.

III.     Petitioner is entitled to resentencing because the statutory sentencing guidelines were misscored as to Offense Variables 4, 7, 8, and 10, and the sentence is a departure from the statutory sentencing guidelines imposed without compliance with departure requirements.

IV.     [Petitioner is] entitled to resentencing on his second-degree criminal sexual conduct conviction where the judge failed to individualize the sentence, the court did not fill out a sentencing information report for that offense, and the 40-to-60-year sentence was a departure from the statutory sentencing guidelines without articulation of any reason for the departure.

Petitioner also filed a supplemental *pro per* brief, raising the following three additional claims:

V.     Where [Petitioner] was on trial for several charges, including delivery of alcohol to a minor and delivery of marijuana to a minor, the trial court abused its discretion and violated rights of [Petitioner] when [the] trial judge made a prejudicial statement which was not supported by facts but also helped to sway the jury's decision as to the outcome of the verdict by stating during jury instructions that the [Petitioner] as much as admitted to supplying this stuff to these kids and "I believe this to be true."

VI.     The trial court erred when [Petitioner] was sentenced to concurrent terms under the Habitual Offender Act, which was erroneous as the [Petitioner] was not charged at his original arraignment or up until his second preliminary examination where charges were amended but no 4th habitual supplemental information was charged.

VII.     Where abuse of discretion happened where [the] prosecutor was allowed to charge [Petitioner] with

14

> multiple charges that were derived from one alleged
> act of CSC and where [the] trial court erred [when] it
> allowed the jury to convict on all charges whe[re] no
> unanimous decision instruction was [] given for [a]
> unanimous verdict on one charge, [the] judge allowed
> [the] jury to "slap" together all charges under one
> verdict without separation or explanation.

On February 24, 2004, the Michigan Court of Appeals affirmed Petitioner's convictions but remanded for resentencing. *People v. Taylor*, No. 240344, 2004 WL 345299 (Mich. Ct. App. Feb. 24, 2004). Petitioner filed a timely application for leave to appeal in the Michigan Supreme Court, raising the same first three claims that he raised before the Court of Appeals. The Michigan Supreme Court denied the application on July 29, 2004. *People v. Taylor*, 683 N.W.2d 676 (Mich. 2004).

Subsequently, on June 13, 2005, Petitioner filed a motion for relief from judgment pursuant to Mich. Ct. R. 6.500, *et. seq.*, in the Saginaw County Circuit Court, raising the following claims:

I.   Did trial counsel's unprofessional performance deprive [Petitioner] of his Sixth Amendment right to have effective assistance of counsel by failing to fully use the adversarial process, by failing to protect [Petitioner's] right to due process, and his right to a fair trial which is guaranteed by both the state and federal constitutions?

II.  Was it an abuse of discretion where the trial court entered more than one judgment of sentence and conviction for a single act, which resulted in a denial of due process and is contrary to what the Legislature intended, or the federal statutes allow?

III. Is it a violation of the Due Process Clause where [Petitioner] was improperly sentenced and remanded to the Department of Corrections when there was no specific sentence for the predicate charge of delivery of marijuana to a minor?

15

IV.     Is it a violation of the Due Process Clause, the Equal
        Protection Clause, and [Petitioner's] right of access to
        the courts where [Petitioner] has been denied
        preliminary examination transcripts of April 23, 2001?

V.      Was [Petitioner] denied due process and his Sixth
        Amendment right to the effective assistance of
        appellate counsel where counsel failed to raise
        several meritorious issues on his appeal of right,
        resulting in the omission of several "dead bang
        winners."

On August 12, 2005, the trial court denied Petitioner's motion for relief from

judgment. *People v. Taylor*, No. 01-020077-FC (Saginaw County Circuit Court, Aug.

12, 2005).

Petitioner then filed applications for leave to appeal from that decision in both the

Michigan Court of Appeals and the Michigan Supreme Court, which were both denied.

*People v. Taylor*, No. 268731 (Mich. Ct. App. Sept. 15, 2006); *People v. Taylor*, 725

N.W.2d 333 (Mich. 2006).

On February 14, 2007, Petitioner filed his petition for a writ of habeas corpus,

which he signed on February 6, 2007.  Petitioner seeks the issuance of a writ of habeas

corpus on the following grounds:

I.      Where [Petitioner] was on trial for first-degree criminal
        sexual conduct, the trial court abused its discretion
        when it denied [Petitioner's] motion for a mistrial
        following a witness' unfairly-prejudicial comment that
        [Petitioner] was "already a killer."

II.     [Petitioner was] denied his due process right to a fair
        trial where the trial court admitted, over objection,
        other acts evidence contrary to MRE 404(b) where
        there was no proper purpose offered, no logical
        relevance, the acts were not similar, and the evidence
        was more prejudicial than probative.

16

III.    [Petitioner is] entitled to resentencing because the statutory sentencing guidelines were misscored as to Offense Variables 4, 7, 8, and 10, and [] the sentence is a departure from the statutory sentencing guidelines imposed without compliance with departure requirements.

IV.    Did trial counsel's unprofessional performance deprive [Petitioner] of his Sixth Amendment right to have effective assistance of counsel by failing to fully use the adversarial process, by failing to protect [Petitioner's] right to due process, and his right to a fair trial which is guaranteed by both the state and federal constitutions?

V.    Was it was an abuse of discretion where the trial court entered more than one judgment of sentence and conviction for a single act, which resulted in a denial of due process and is contrary to what the Legislature intended, or the federal statutes allow?

VI.    Is it a violation of the Due Process Clause where [Petitioner] was improperly sentenced and remanded to the Department of Corrections when there was no specific sentence for the predicate charge of delivery of marijuana to a minor?

VII.    Is it a violation of the Due Process Clause, the Equal Protection Clause, and [Petitioner's] right of access to the courts where [Petitioner] has been denied preliminary examination transcripts of April 23, 2001?

VIII.    Was [Petitioner] denied due process and his Sixth Amendment right to the effective assistance of appellate counsel where counsel failed to raise several meritorious issues on his appeal of right, resulting in the omission of several "dead bang winners."

## II.  STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs

this court's habeas corpus review of state-court decisions and states in pertinent part:

17

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

28 U.S.C. § 2254(d); *Harpster v. State of Ohio*, 128 F.3d 322, 326 (6th Cir. 1997).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to a conclusion reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" occurs when the state court identifies the correct legal principle from a Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

### III. DISCUSSION

### A. Claim I–Denial of Mistrial Claim

Petitioner first asserts that he is entitled to habeas relief because the trial court erred in denying his mid-trial motion for mistrial. The defense moved for a mistrial following a comment made by witness G.H. that Petitioner was a "killer." The trial court

18

denied the motion but issued a curative instruction.  A trial court has the discretion to grant or deny a motion for mistrial in the absence of a showing of manifest necessity. *See Walls v. Konteh*, 490 F.3d 432, 436 (6th Cir. 2007); *Clemmons v. Sowders*, 34 F.3d 352, 354-55 (6th Cir. 1994).  To the extent a petitioner's argument is based upon state law, the petitioner has failed to state a claim upon which habeas relief may be granted. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  A question concerning a perceived error of state law serves as a basis for habeas corpus relief only when the petitioner is denied fundamental fairness in the trial process.  *Estelle*, 502 U.S. 62, 67-68 (1991).  The rulings by a state's highest court with respect to state law are binding on the federal courts.  *Wainwright v. Goode*, 464 U.S. 78, 84 (1983).  Furthermore, the Supreme Court has "reemphasize[d] that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle*, 502 U.S. at 68.  The federal courts are bound by decisions of an intermediate state appellate court unless convinced that the highest state court would decide the issue differently.  *Olsen v. McFaul*, 843 F.2d 918, 929 (6th Cir. 1988).  The Michigan Court of Appeals, the last court to issue a reasoned decision in this case, stated in pertinent part:

> Defendant first alleges that the trial court abused its discretion when it denied the defense motion for a mistrial following the comment of a witness that defendant was a "killer."  We disagree.  Our review of the trial court's denial of a motion for mistrial is for an abuse of discretion.  *People v. Gonzales*, 193 Mich.App 263, 265; 483 NW2d 458 (1992). To successfully move for a mistrial, a defendant must demonstrate that a prejudicial irregularity interfered with the court's ability to provide a fair trial.  *People v. Griffin*, 235 Mich.App 27, 36; 597 NW2d 176 (1999).  Where the error is so egregious that the prejudicial effect cannot be removed in any other way, a mistrial should be granted.  *Gonzales, supra*.  However, an unresponsive, volunteered answer to a

19

> proper question does not present grounds for granting a mistrial. *Griffin*, *supra*.
>
> In this case, defense counsel did not immediately object and request a mistrial. Rather, the witness either spoke so quietly or mumbled to such an extent that defense counsel did not hear the statement and had to be advised of the statement by others. After the witness volunteered that defendant was a "killer," the prosecutor did not dwell on the subject or repeat the statement, but rather, received confirmation from the witness that he feared defendant. Upon being advised of the statement, the trial court denied the request for a mistrial, but provided the jury with a curative instruction. Accordingly, based on this record, we cannot conclude that the trial court's denial of the request for a mistrial was an abuse of discretion. *Gonzales*, *supra*.

*Taylor*, 2004 WL 345299, at *1-2.

This determination is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or an unreasonable application of the facts. First, to the extent that Petitioner relies upon state law to support this argument, he fails to state a claim for habeas relief. It is well-settled that habeas relief may not be granted for alleged violations of state law. *See Estelle*, 502 U.S. at 67-68. Second, an evidentiary ruling violates due process and warrants habeas relief only when it is "so egregious that it results in a denial of fundamental fairness." *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *Clemmons*, 34 F.3d at 356.

Alternatively, this claim could be viewed as an alleged violation of due process. As explained by the United States Supreme Court in *Lisenba v. California*, 314 U.S. 219 (1941):

> As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected

20

the trial; the acts complained of must be of such quality as
necessarily prevents a fair trial.

*Id.* at 236.  Moreover, a constitutional error that implicates trial procedures is considered

harmless on habeas review unless it had a "substantial and injurious effect or influence

in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

In this case, during direct examination, the prosecution asked fifteen-year-old

G.H. why he did not report the incident to the police immediately.  G.H. indicated that he

was scared.  When the prosecutor asked G.H. if he was afraid that he would get in

trouble, G.H. responded yes, and added "[Petitioner's] already a killer," and therefore,

G.H. testified, he did not tell anyone about the incident.  (Trial Tr. vol. I, 149.)

The court finds that G.H.'s remark was not explored or repeated, and, thus, any

error, if in fact an error occurred, had no or very slight effect on the jury's decision.

Moreover, the trial court gave the jury a curative instruction.  For those reasons, the

Michigan Court of Appeals's decision regarding this issue was neither contrary to, nor

an unreasonable application of, clearly established Supreme Court precedent, and

Petitioner is therefore not entitled to habeas relief on this claim.

### B.  Claim II–Other Acts Evidence Claim

Petitioner next argues that the trial court improperly admitted other acts evidence

under M.R.E. 404(b).  The Michigan Court of Appeals, the last court to issue a reasoned

decision regarding this claim, stated in pertinent part:

Defendant next alleges that the trial court abused its
discretion by admitting other acts evidence.  We disagree.  A
trial court's decision to admit other acts evidence under MRE
404(b) will be reversed only where there has been a clear
abuse of discretion.  *People v. Crawford*, 458 Mich. 376,
383; 582 NW2d 785 (1998).  To admit MRE 404(b)

> evidence, it must be offered for a proper purpose, it must be relevant, the probative value of the evidence must not be substantially outweighed by unfair prejudice, and a limiting instruction may be provided upon request. *People v. VanderVliet*, 444 Mich. 52, 55; 508 NW2d 114 (1993), *amended* 445 Mich. 1205 (1994). The examination of the probative value in light of any unfair prejudice is merely a balancing process. *People v. Starr*, 457 Mich. 490, 498; 577 NW2d 673 (1998). The rule seeks to avoid unfair prejudice, not prejudice that stems from the abhorrent nature of the bad act. *Id.* at 500.
>
> Based on the record available, we cannot conclude that the trial court's decision to admit evidence was an abuse of discretion. *Crawford*, *supra*. The testimony was offered to demonstrate defendant's scheme or plan to obtain sexual favors from young girls by plying them with alcohol and drugs. Two young female witnesses testified that defendant approached them for sexual contact in a manner similar to his method of approaching the victim. However, defense counsel was able to establish that the other acts were merely suggestive comments by defendant and did not result in sexual activity. Moreover, defendant was able to establish through his own witnesses that he was an impossible flirt, who frequently complimented women of all ages.

*Taylor*, No. 240344, 2004 WL 345299, at *2-3.

To the extent a petitioner's argument is based upon state law, the petitioner has failed to state a claim upon which habeas relief may be granted. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). A question concerning a perceived error of state law serves as a basis for habeas corpus relief only when the petitioner is denied fundamental fairness in the trial process. *Estelle*, 502 U.S. at 67-68.

The rulings by a state's highest court with respect to state law are binding on the federal courts. *Wainwright v. Goode*, 464 U.S. 78, 84 (1983). Furthermore, the Supreme Court has "reemphasize[d] that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at

22

68.  The federal courts are bound by decisions of an intermediate state appellate court

unless convinced that the highest state court would decide the issue differently.  *Olsen*

*v. McFaul*, 843 F.2d 918, 929 (6th Cir. 1988).  To determine whether the admission or

inadmissibility of evidence has denied a defendant's fundamental due process rights,

the court should consider the extent to which the evidence is "critical" to the case,

whether it "tend[s] to exculpate" the accused, and whether the evidence bears

"persuasive assurances of trustworthiness."  *Clark v. O'Dea*, 257 F.3d 498, 503 (6th Cir.

2001).

The Sixth Circuit has specifically upheld state convictions against similar habeas

challenges involving Rule 404(b) evidence on the ground that the use of such evidence

in those cases was not fundamentally unfair.  *See Burton v. Renico*, 391 F.3d 764,

773-75 (6th Cir. 2004); *Coleman v. Mitchell*, 244 F.3d 533, 542-43 (6th Cir. 2001).  The

same conclusion is warranted in this instance.

The Michigan Court of Appeals, in reviewing Petitioner's claim held that, "the

testimony was offered to demonstrate [Petitioner's] scheme or plan to obtain sexual

favors from young girls by plying them with alcohol and drugs," and thus found that its

admission was not an abuse of discretion.   *Taylor*, 2004 WL 345299, at *2.

Consequently, this court concludes that the Michigan Court of Appeals's holding

as to the introduction of the 404(b) evidence was not contrary to, or an unreasonable

application of, clearly established federal law so as to entitle Petitioner to habeas relief.

### C.  Claim III–Sentencing Claim

Next, Petitioner argues that he is entitled to resentencing because the trial court

misscored the state sentencing guidelines.  A habeas petitioner's claim that the trial

court violated state law when sentencing him is not cognizable in habeas corpus

proceedings.  *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v.*

*Butler*, 825 F.2d 921, 924 (5th Cir. 1987).  Federal habeas courts have no authority to

interfere with perceived errors in state law unless the petitioner is denied fundamental

fairness in the trial process.  See *Estelle*, 502 U.S. at 67-68 (1991).

Petitioner's claim that the trial court improperly scored or departed from the

guidelines range raises issues of state law that are not cognizable on habeas review.

*See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (holding that a claim

that sentencing court departed from Michigan sentencing guidelines presents an issue

of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*,

49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (same); *see also Branan*, 851 F.2d at 1508

(holding that a claim that court misapplied state sentencing guidelines not cognizable on

habeas review).  Thus, Petitioner is not entitled to habeas relief on his claims relating to

the trial court's scoring of, or departure from, the Michigan sentencing guidelines.

### D.  Procedural Default of Claims IV-VIII

In his remaining claims, Petitioner alleges that: (1) his trial counsel was

ineffective regarding his knowledge that furnishing marijuana to minors was a

misdemeanor rather than a felony and that admitting to furnishing alcohol and

marijuana, but denying the criminal sexual conduct charges, was unsound trial strategy;

(2) the prosecutor confused the jury by charging multiple counts of criminal sexual

conduct for an alleged single act, and failed to inform the jury that delivery of marijuana

to a minor was a misdemeanor rather than a felony; (3) his conviction and sentence on

multiple counts of criminal sexual conduct arising from the alleged same continuous act

24

violated double jeopardy; (4) the trial court's comment that he would be remanded to the jurisdiction of the Department of Corrections after serving his minimum sentence was an illegal sentence; and (5) he was denied access to the courts because he did not receive a transcript of the first preliminary examination hearing.  Respondent contends that these claims were not properly exhausted in the state courts and are now barred by procedural default.

A prisoner filing a petition for a writ of habeas corpus under 28 U.S.C. § 2254 must first exhaust all state remedies.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("[S]tate prisoners must give the state courts one full fair opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."); *Rust v. Zent*, 17 F.3d 155,160 (6th Cir. 1994).  A Michigan prisoner must raise each issue he seeks to present in a federal habeas proceeding before both the Michigan Court of Appeals and the Michigan Supreme Court to satisfy the exhaustion requirement.  *See Mohn v. Bock*, 208 F.2d 796, 800 (E.D. Mich. 2002); *see also Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).  The burden is on the petitioner to prove exhaustion.  *Rust*, 17 F.3d at 160 (citing *Darr v. Burford*, 339 U.S. 200, 218-19 (1950)).

The court agrees that Petitioner has not properly exhausted the above-stated claims in the state courts.  Petitioner first raised these claims in a motion for relief from judgment under Mich. Ct. R. 6.500, *et. seq.*  The motion was denied for failing to establish entitlement to relief under Mich. Ct. R. 6.508(D).  It is well-established in this circuit that the procedural bar set forth in Mich. Ct. R. 6.508(D) is an adequate and independent ground to foreclose review of federal claims.  *Howard v. Bouchard*, 405

25

F.3d 459, 477 (6th Cir. 2005).  In *Burroughs v. Makowski*, 282 F.3d 410, 413-14 (6th Cir. 2002), the Sixth Circuit considered the form used by the state appellate courts and found it presented a sufficient explanation that the ruling was based on failure to comply with a state procedural rule.  *See also McFarlan v. Yukins*, 356 F.3d 688, 697-98 (6th Cir. 2004).

A state prisoner's habeas claims are procedurally defaulted if the prisoner has failed to comply with an adequate and independent state procedural rule, thus causing default of the prisoner's federal claims in state court.  *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  This can occur when an individual fails to present an issue to a state appellate court upon the only opportunity to do so.  *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989); *Rust*, 17 F.3d at 160.  In *Coleman*, the United States Supreme Court held that if the decision of the last state court to which a habeas petitioner presented his federal claims fairly appeared to rest primarily on federal law, or to be interwoven with federal law, and did not clearly and expressly rely on adequate and independent state grounds, a federal court may address the petition.  *Id.* at 735.  The Court went on to note:

> This rule does not apply if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.  In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims [citation omitted].

*Id.* at 735 n.1.

The United States Court of Appeals for the Sixth Circuit employs a four-part test to determine whether a state procedural default bars federal habeas review.  The inquiry is whether:

> (1) a state procedural rule exists that applies to the petitioner's claim, (2) the petitioner failed to comply with the rule, (3) the state court actually applied the state rule in rejecting the petitioner's claim, and (4) the state procedural rule is an adequate and independent ground upon which the state can rely to deny relief.

*Frazier v. Huffman*, 343 F.3d 780, 790 (6th Cir. 2003) (citing *Reynolds v. Berry*, 146 F.3d 345, 347 (6th Cir. 1998)); *see also Alexander v. Smith*, No. 06-1569, 2009 WL 426261 (6th Cir. Feb 20, 2009).  Here, the procedural rule relied upon by the state appellate courts to bar review of these issues was firmly established and regularly applied at the time of Petitioner's default.  Petitioner thus procedurally defaulted these habeas claims.

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of (1) cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or (2) a fundamental miscarriage of justice.  *See Coleman*, 501 U.S. at 753; *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996).  The cause and prejudice test should be applied to all occasions where a procedural default bars state litigation of a constitutional claim.  *Coleman*, 501 U.S. at 750.  Petitioner contends that his appellate counsel was ineffective in raising the claims in his direct appeal, and therefore, he has established the necessary cause and prejudice to excuse the

27

procedural default.  Petitioner also argues that the court's failure to review these claims would result in a fundamental miscarriage of justice.

To the extent that Petitioner attempts to establish cause to excuse his procedural default by claiming that his appellate counsel was ineffective for failing to raise his claims in his direct appeal, he does not do so.  Attorney error will not constitute adequate cause to excuse a procedural default unless it amounts to constitutionally ineffective assistance of counsel under the criteria established in *Strickland v. Washington*, 466 U.S. 466 U.S. 668, 687 (1984).  The mere failure to raise a claim, even if it is meritorious on appeal, does not constitute ineffective assistance of appellate counsel sufficient to establish cause to excuse a procedural default.  The United States Supreme Court, in *Smith v. Robbins*, 528 U.S. 259 (2000), stated:

> In *Jones v. Barnes*, 463 U.S. 745 (1983) [parallel citations omitted], we held that appellate counsel who filed a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal. Notwithstanding *Barnes*, it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent.  See, e.g., *Gray v. Greer*, 800 F.2d 644, 646 (C.A. 7 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.").

*Id.* at 288; *see also McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000) (finding that where a claim was not "dead bang winner," the petitioner's appellate counsel's failure to raise it on direct appeal did not constitute cause to excuse procedural default).

In this case, the record reveals that various issues were raised in Petitioner's direct appeal, but that Petitioner's convictions were nonetheless affirmed.  Petitioner

28

fails to demonstrate that the issues that were allegedly ignored by his appellate counsel in his direct appeal were clearly stronger than those that were presented, and he has failed to overcome the strong presumption that his counsel was competent.  Because Petitioner has failed to establish cause for his procedural default, there is no need to determine whether Petitioner can meet the prejudice prong of the "cause and prejudice" test.  *Coe v. Bell*, 161 F.3d 320, 329 (6th Cir. 1998).

Neither has Petitioner established that a fundamental miscarriage of justice has occurred.  The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent.  *See Schlup v. Delo*, 513 U.S. 298, 326-27 (1995); *Murray v. Carrier*, 477 U.S. at 496. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 624 (1998).  "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial."  *Schlup*, 513 U.S. at 324.  Petitioner has made no such showing.  His assertion that his habeas claims have merit does not establish a miscarriage of justice.  The remaining of Petitioner's claims are thus barred by procedural default and do not warrant federal habeas relief.

## IV.  CERTIFICATE OF APPEALABILITY

A petitioner must receive a certificate of appealability ("COA") in order to appeal the denial of a habeas petition for relief from either a state or federal conviction.  28 U.S.C. §§ 2253(c)(1)(A), (B).  A district court, in its discretion, may decide whether to issue a COA at the time the court rules on a petition for a writ of habeas corpus or may

wait until a notice of appeal is filed to make such a determination. *See Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002); *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1072 (6th Cir. 1997), *overruled in part on other grounds by Lindh v. Murphy*, 521 U.S. 320 (1997). In denying the habeas petition, the court has studied the case record and the relevant law, and concludes that, as a result, it is presently in the best position to decide whether to issue a COA. *See Castro*, 310 F.3d at 901 (quoting *Lyons*, 105 F.3d at 1072) ("[Because] 'a district judge who has just denied a habeas petition . . . will have an intimate knowledge of both the record and the relevant law,'" the district judge is, at that point, often best able to determine whether to issue the COA).

A court may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a federal district court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. *Id.* at 336-37. When a federal district court denies a habeas claim on procedural grounds without addressing the merits, a certificate of appealability should issue if it is shown that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable

30

whether the district court was correct in its procedural ruling.  *See Slack*, 529 U.S. at 484-85.

Therefore, the court concludes that jurists of reason would not find the court's assessment of the constitutional claims debatable or wrong, or that the court's ruling that Petitioner's claims are barred by procedural default debatable.  The court will thus decline to issue Petitioner a certificate of appealability.

## V.  CONCLUSION

For the reasons stated above, the court concludes that Petitioner is not entitled to federal habeas relief on the claims contained in his petition.

Accordingly, IT IS ORDERED that the petition for a writ of habeas corpus [Dkt. #1] is DENIED.

IT IS FURTHER ORDERED that the court DECLINES to issue Petitioner a certificate of appealability.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  May 29, 2009

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 29, 2009, by electronic and/or ordinary mail.

s/Lisa G. Wagner
Case Manager and Deputy Clerk
(313) 234-5522